I will be handling an argument about interstate commerce on the extortion counts as well as the embezzlement counts. I believe Mr. Tomposky will talk about the prior bad acts 403 issue. So it's our position that the government failed to prove that attempted extortion aimed at transferring intangible rights in a fledgling Massachusetts company among individuals could not have had an effect on interstate commerce. This court held in the Clem Act that the government must make a heightened showing of effect on interstate commerce when, as here, the extortion target is an individual. Excuse me, counsel. I don't think that's fair characterization of our McCormick decision. There is nothing about a heightened showing. What we said is that in an individual, the analysis is multifaceted and fact specific. And that's true. And it may require looking at more or different facts than it might with a corporation that is in business. But you haven't cited a single case, and I'm aware of none, in this circuit or any else, any other circuit, that says that there is a heightened standard. So I don't mean to suggest the standard itself is different. I think what I'm suggesting is the language in the court right here, the word heightened is used, and the court just needs to take a closer look at the various facets. So I didn't mean to sidetrack the court with suggesting the actual underlying standard is different. Here, the government essentially puts all its eggs in the asset depletion basket. That's their theory of how interstate commerce could be affected. The sort of historic core of that theory in case law deals really just with corporations. It basically says if a corporation loses money to an extortionist, that's less money that can be spent in interstate commerce. That's the nexus. That has now been applied to individuals as well. The case that the government cites, which I think is the main one in this circuit, is Devin, Judge Sully's opinion. And in that situation, extortion of money by a corral police officer over an individual who is an executive in a corporation over many, many years was found to potentially affect commerce because the thought was over that amount of time, some of the money surely came from profits of the corporation or money that the corporation could have used otherwise. But the key thing about that case and Hedman, the case from I think the seventh circuit on which it relies, and really all of the asset depletion cases, is that the asset at issue is money. Cash. Judge Sully has said in Devin that a further attenuation in an individual is the source of a corporation. And that causal chain, I would suggest, breaks entirely in a situation like you have here where we're not talking about money. There is no direct effect on commerce if there is no sort of depletion of money. And there is no case that I'm aware of, certainly none the government has cited, to suggest otherwise. So really, for the court to find an interstate commerce nexus here would be stretching the commerce clause well beyond where it's ever been. I mean, I understand the standard is not terribly demanding, but when we're talking about intangible rights among Massachusetts residents in a Massachusetts company, I would suggest the attenuation just goes way too far. And absence any analogous case in any circuit of finding interstate commerce nexus, I would suggest that there is none here. On the embezzlement counts, the government failed to prove that the... I thought there was only one that was remaining in front of us. So that's right. The government has withdrawn its opposition to the appeal of count three. My understanding is the reason they did so is because... We're not interested in the reason, counsel. What counts is that that count's not before us. Okay. Thank you, Your Honor. So as to the other count, there's one argument, first of all, that applied to both counts and I think is still in play. That is that Section 24B, which defines a health care benefit program, essentially has two requirements as to providers. One is that the provider is providing services, and two is that the provider may be paid under the plan or contract at issue. And as to count five, it's true that at the time of that count, the clinic has started As to count four, there's no dispute that the clinic had started serving patients. However, at that time, there was not in place any contract with a payor. And to suggest that the language in the statute may be made could apply to an aspirational health care provider that doesn't... It's not even a question of whether they're actually getting paid, but there's not even a contract in place under which payment could be made. But what difference does that make if there was a stipulation in place? Well, the stipulation, first of all, has never entered into evidence. But what difference does it make? Well, if the stipulation is not in evidence, then it's not before the jury, it's not part of the sufficiency calculus. No, no. I mean, that's a very handy conclusion from your point of view, but it's not borne out by the law or the case law. What we said in a very similar situation in the United States against Pratt is that, yes, there's a technical error when the stipulation is not communicated to the jury, as it should be, but there's no injustice when the stipulation actually exists when the party has agreed not to contest that element of the offense. And when the error is harmless, because the argument you're really making is the jury should have had this stipulation which would have made it absolutely clear to them that the government's position on this issue was correct. So you can't complain about the omission of that, of that technical presenting it to the jury, as long as the stipulation itself is bona fide. And there's been no challenge to the bona fides of the stipulation. Substantively, there is argument that the stipulation was factually incorrect. As of the date of the counts, particularly count four, which was November 19th, it is factually incorrect to say that the clinic was a health care benefit program. That's a nice argument on appeal, but stop and think of the mayor's nest that you'd have us create. A party can stipulate to fact acts, let the case go to the jury, be decided with the jury on appeal that the stipulation that he entered into was factually incorrect. Courts have confronted that situation and have said, well, if we're convinced that there's a real injustice, we may vacate the stipulation. But here the district court made that inquiry and decided that there was no injustice. If I may briefly answer, whereas here the stipulation is factually erroneous and without that stipulation, without that fact, no federal crime occurred, I would suggest that gross injustice standard has been met. Before you step back, Judge Torea, any questions? No. Okay, good. Good morning. Michael Teposkey on behalf of John Locke Tequila Shpeely. The court below abused its discretion in admitting evidence of several prior bad acts that witnesses testified the defendant had committed or was rumored to have committed, specifically evidence that he abused his girlfriend, that he threatened to cut his girlfriend, and a rumor that he had stabbed someone in downtown Boston. So I'm going to go through the three factors, the probative value of the evidence, the unfair prejudice, and then the balancing. As to the probative value, when you are talking about the probative value of prior bad acts in the extortion context, I think it's helpful to put them in sequences. Most relevant to less or not relevant at all. So any prior bad act that the defendant communicated to the victim directly would be relevant. Prior bad acts that the victim knew about and the defendants knew the victim knew about, that would be relevant but slightly less so. Prior bad acts that the victim knew about but the defendants themselves had no idea he knew about, I think the relevance of those is at best marginal. And prior bad acts that the victim had no particular knowledge of would be irrelevant. And so the prior bad acts at issue here were ones that the victim was aware of but they had not been communicated to him by John Milotsky. Doesn't it matter whether the record here gives rise to a reasonable inference or can it rise to a reasonable inference that the defendants may reasonably have thought that the defendant was aware of these? They knew that the victim was aware of these. They knew that the victim had been associating with the supposedly assaulted girlfriend. They knew that the defendant had been working with their former employees and associates. There was no evidence from which the jury could infer that the defendants were aware that the victim knew about these particular acts. Why does that have to be shown? Isn't it just as important that the victim actually be in fear? And doesn't all this evidence go to that piece of it? The victim's fear is less important in a case of attempted or conspiracy to commit extortion because the elements required are the defendant's state of mind, not the victim's. Now the court has said that a victim's fear in an attempted and uncompleted extortion is relevant under certain circumstances but not as relevant as the defendant's state of mind. I don't understand the gradation of relevance. It's relevant or it's not relevant. Well, no, because when you apply the balancing test under 403, the probative value or level of the relevance is important. But we're not there yet. Certainly. Okay, so are you acknowledging that they make it on this first part? What I'm acknowledging is that at best, evidence that the victim was in fear is marginally relevant. Yes, if there's no evidence that the defendants were aware of the reason, it's marginally relevant. That's my argument. And that was one of the rationales the court gave for admitting it. The other was this notion that it showed the bias of the girlfriend herself, which I argue my brief is circular. I don't need to address it here. So if there's at best marginal relevance to the victim's fear based on his own understanding without any evidence the defendants either contributed to it or were aware or exploited it, then you have to look at the unfair prejudice that flows from the admission of acts of domestic violence and a supposed stabbing. And I think one factor that's important to consider is the similarity between the prior bad act and the charged offense. Extortion is essentially an assault with federal jurisdiction. It's a threat with federal jurisdiction. And the prior bad acts particularly were of the violent type or assaulted behavior. And courts have repeatedly cautioned that the more similar a prior act is to the charged offense, the more there's a risk of unfair prejudice. And I think particularly with the domestic violence, that the emotional nature of that type of crime is one that strikes a chord with alters. And so the court has to be particularly careful in making a prior bad act of domestic violence to watch out for the potential danger of unfair prejudice. And so when you then go to the balancing test, I want to highlight in my brief, I think the key case there, which Judge Salier was on the panel for, is Veridacus. And in that case, as here, the court found there was marginal relevance in the admission of a prior arson of a car when the defendant was on trial for arson of a restaurant. But what the court said was that because, number one, the crime in that case was identical, the prior crime was identical to the charged offense, number one, and number two, because the probative value of the prior act was so low, the government didn't need the evidence to prove its stated reason for offering it. They had overwhelming evidence in that case of the relationship between the parties that on the balancing test the evidence should have been excluded. So to here was their overwhelming evidence, not contested by Jambalat Tequilishvili, that the victim was afraid. He testified he was afraid. He testified he was terrified. Jambalat Tequilishvili-Bolel never made an argument that his fear wasn't genuine. It was not disputed by him. And so the government did not need to put on this additional evidence to show that the victim was afraid of Jambalat Tequilishvili. This was put in in the case in chief? These weren't rebuttal witnesses? Case in chief. After the victim had testified, after all the evidence of his fear had been directly put to the jury, the government knew that that element, quite frankly, was not going to be something that the jury was deciding Jambalat Tequilishvili's guilt over. They weren't going to decide that issue. Our defense below was that simply the threats from Jambalat Tequilishvili never happened. It wasn't an issue of whether the victim was truly afraid or pretending. So that wasn't a disputed issue, and given that it wasn't, the court improperly applied a balancing test and abused its discretion in doing so, and the error was prejudicial. Judge Torea? Thank you. I have nothing to say. Thank you. Good morning, Your Honors. Alexis Vincentus on behalf of the government. I'd like to begin, if I may, with the question of the interstate commerce nexus. The defendants in this case recruited Victor Terosian as the sole investor in a business operating in interstate commerce, and just as that business was turning to the point that it could begin to make money, they attempted to extort from him a substantial portion of his investment interest in it. A jury could find beyond a reasonable doubt that if the defendants had been successful, there was a realistic probability that their actions would have depleted the investments by Terosian on which the business depended to operate. What do you say about the distinction that defense counsel attempts to make between the fact that this was an extortion of property, that is, an interest in the business, as opposed to an extortion of money? Well, the defendants here have endeavored to paint this case as one being solely about the transfer of a proprietary interest in a business, but in doing so, what they're ignoring is the intimate connection between that business and the victim of their extortion. The evidence here demonstrated that Terosian and Terosian alone provided the investment that was necessary to get this business off the ground, and moreover, that he went to great personal lengths in order to be able to do so. Also, contrary to the claim made in the reply brief, the evidence showed that that funding continued to be necessary to the business's operation during the period of their extortionate conduct. That conduct occurred most pronouncedly here in August and September and November of 2015, and as the defendants themselves have taken pains to point out elsewhere, the clinic was not making any money during that time period. It depended instead on the continued infusions of capital from Victor Terosian, which the evidence showed, as pointed out in the government's brief, went from approximately $400,000 in early August to $580,000 in November and over $700,000 in November. In the government's view, then, this wasn't a case where it was irrelevant whether person A or person B held the investment interest in the company. The clinic depended on Terosian's continued investment, and the jury could reasonably conclude that a result of the defendant's actions would have been to not only deplete the potential assets available to the business in the future by way of a reduction in Terosian's access to potential profits, but also that their actions would have disincentivized Terosian from going to the great personal lengths that he was going to in order to be able to find other sources of funding in the interim. Now, David has correctly noted in his reply brief that in most cases, the asset depletion theory has been applied in instances in which the victim business owner is drawing funds from the business in response to an extortionate threat rather than refusing to infuse money into the business because of it. But that said, those cases nonetheless support the notion that where there is an intimate connection between the victim and the business, the extortion of the victim is likely to have an impact on the funds available to the business. And moreover, as you pointed out in questioning of defense counsel, this court has emphasized that the inquiry regarding whether or not the interstate commerce element is satisfied is one that is a case-specific one. Have our cases required any connection between, in an asset depletion theory, the asset depletion and the business's ability to engage in interstate commerce? Yes, but I think that we very clearly have that here for the reasons already explained. This business could not operate in interstate commerce without the continued funding of victor-trojan. And therefore, particularly given the diminished standard that applies, the government believes that the evidence was sufficient to support a finding, excuse me, support sustaining the defendant's conviction on this count. Turning, if I may, to the count for conviction for the November 19th withdrawal from the HMG account, I think that the most obvious path to affirmance on this conviction is the route followed by the district court, which is defined first that AHC, which was an entity that existed for the sole purpose of earning money through insurance reimbursements, was itself a health care benefit program. And secondly, that AHC was the source of the funds that were drawn from HMG, which itself existed solely for the purpose of providing administrative services to AHC and had no income or assets of its own. Why wasn't the stipulation presented to the jury? I believe, Your Honor, that that was simply a matter of oversight on the government's part. Our position, however, is that even without that stipulation, the evidence was sufficient to show under the plain language of 18 U.S.C. 24B, that Allied was, in fact, a health care benefit program. It had begun providing medical services, and it did so based on a possibility of payment that was confirmed by the non-proton effective dates of its contracts, as well as by the fact that the clerk did, in fact, receive reimbursement for at least some of the services that were provided during that timeframe. Now, in arguing that AHC was, nevertheless, not a health care benefit program, David, importantly, does not dispute that may, when used in its ordinary sense, connotes possibility. What he does instead is point to the statute's use of the term, the plan or contract, in the second clause of 18 U.S.C. 24B to suggest that it somehow imports the requirement that there be a specifically already executed contract in place with an insurance company. But when one looks at the statute, I think it's clear that the use of the term, the, in the second clause is merely referring back to a plan or contract, as that term is defined in the first clause. And it doesn't follow at all from the fact that there must be a specifically identifiable plan or contract in place, that there must also be a contractual agreement already executed with that plan or contract. In fact, had Congress intended that to be the case, it could have done so in a variety of different ways, but it did not, and that determination must be deemed intentional. I would also note that that determination is wholly consistent with the purpose of the statute, which was to combat fraud in the medical services industry. As the varied evidence in this case showed, the use of non-protunct effective dates is not at all uncommon. Of the three insurance contracts that were entered into evidence here with major insurance companies, two of them contained effective dates that well preceded the dates of their execution. And there's no reason to think that Congress wouldn't have intended, with the use of the word may, to capture instances where a medical services provider is in fact billing for services that are provided during the pendency of the contract execution. Turning, in that case, to the evidence that the funds that were drawn from HMG came specifically from AHC, the bank documents that show, that trace the specific $2,000 that were drawn from HMG to an immediately preceding withdrawal from AHC were not properly before the district court on consideration of the Defendant Supplemental Rule 29 motion. But that said, the evidence that the jury did have before it demonstrated that those funds, nonetheless, originated with AHC. What the jury did have before it was uncontested evidence that HMG existed for the sole purpose of providing administrative services to AHC and that it had no income or assets of its own, meaning that the only place that these funds could have come from was AHC. The record belies the suggestion and the reply that perhaps the money could have filtered. I'm not sure that that necessarily follows. What the jury had before it. Did the jury have before it any evidence as to the capitalization of HMG? Well, what the record does show, Your Honor. Could you please answer my question? Yes. Did the jury have before it any evidence as to the capitalization of HMG? There was no evidence whatsoever in the record to suggest that HMG. Why couldn't they? So it is therefore possible in the absence of evidence that the jury could assume that there was some capital invested to start HMG. There's nothing in the record that contradicts that. I don't think that point is correct, Your Honor. In that regard, I would point the court to Exhibit 24, which is at Joint Appendix page 1320, which clearly shows that Terosian's deposits into the various clinic accounts between November 2014 and December 2015 total $248,100. And then Exhibit 27, which is at Joint Appendix 1324, specifies that those same $248,100 were deposited into Bank of America accounts that specifically belong to AHC. And I understand, Your Honor's point, that there's no evidence to suggest that HMG wasn't- Wouldn't it have been a lot easier for the government to just do its homework and put the stipulation before the jury, wouldn't it? It is unfortunate that the stipulation did not go in line- It's not unfortunate. It's close to inexcusable. And it's just sloppy practice. It was an unfortunate oversight on the government's part, but the government believes that the evidence is nonetheless sufficient on this count. Your Honor noted that there wasn't any evidence regarding the capitalization of HMG, but what I would note is there was no evidence whatsoever to suggest that HMG was allocated any funding by AHC for the services that it was providing. And, in fact, there's no evidence to suggest that HMG was allocated any funding whatsoever other than on an as-needed basis for specific expenses. And, in fact, there's no suggestion in the record that HMG did anything other than process payroll payments. And the record showed, moreover, that those payroll payments were rather sporadic and irregular. And this argument you're making to us, this argument, I assume, was made to the jury? That argument specifically was not made to the jury, unfortunately. So, in an effort to make up for the rather egregious error of not presenting the stipulation to the jury, you now want us to engage in a fiction that, well, the jury, had they been addressed to the question, which they weren't either by the government's summation or in any other way, could have pieced this together for themselves from these documentary exhibits. You know, we're not engaged in writing whodunits. The fact of the matter is the government's failure to introduce the stipulation properly may be excusable because there was no objection to it, because it wasn't timely raised by the defendants. But that's not to say that we should go the long way around the barn and engage with you in a fiction to try to cover up the government's failure. And I hate to be blunt about it, but that's what it amounts to. And I'm trying to tell you that I resent this line of argument. Because you're just making it up as you go along. You know, I know, and defense counsel knows that the jury never made any such determination comparing this statement to that statement to see where the funds in HMG came from. They weren't asked to do it, and there's no reason to believe that they would have known that. Nonetheless, Your Honor, the evidence was before the jury regarding the source of those funds, and the government believes that the absence of evidence to suggest that the funds could have come from anywhere but an antecedent withdrawal from HMG would have been sufficient. Why don't you take a minute and address the 404B evidence. Yes, Your Honor. I think the defendant's objection on this count is effectively disposed of by reference to this court's decision in Godoke. The court in that case made clear that the question of the victim's fear is in ways relevant to determining whether the defendant's intended to induce fear in the victim by way of their actions. And that case also shows that what's relevant is not only the words and actions of the defendant, but what the defendant, given the circumstances, would reasonably have believed the victim would have known. And the evidence here was clear that what we are dealing with... The counsel says that that part of it is not as important, and therefore this is marginally relevant evidence. Or relevant but to marginal effect, I think, is the real point. What do you say to that? I just don't think that that argument is borne out by reference to... Excuse me, by a reading of Godoke. Again, I think that case makes clear that it is relevant. And moreover, whatever prejudicial effect might have flown from the other act's evidence in this case, I think was effectively dispelled out by way of the district court's limiting instructions. The district court gave instructions contemporaneously with this evidence being entered into evidence that made clear that it was to be used for one purpose and one purpose only, and that was to determine the defendant's intent. The district court also, in its final instructions to the jury, again reiterated this point with input from defense counsel to ensure that the evidence was used only for purposes that would have been permitted under 404B. Was there a motion eliminated that addressed the fact that none of the victim's state of fear would be an issue in the case? There was quite a bit of motion eliminated practice regarding other act's evidence. But did it go to that point, do you recall? Did it go to the point that the defendant was not going to be contesting the victim's level of fear? I don't recall off the top of my head, Your Honor, whether that particular bit was raised in the motion eliminated. But what was clear here was that the core of the defense in this case was to question the credibility of Victor Terosia. Even in their closing arguments, the defendants were arguing that the case was going to rise and fall on his testimony. And particularly given where the case did very much depend on his testimony and his testimony was called into question, this evidence was important to his credibility. But with due respect, counsel, I think that misses the point of Chief Judge Howard's question. Was level of fear a contested element of the trial? Defense counsel says the defendant conceded it. My view of the record, Your Honor, is that he did not concede it. In fact, even in his brief on appeal, one of the defendants has argued that there was an absence of any evidence that he was in fact in fear of it. Before you sit down, Judge Turek, do you have additional questions of the government? I have no additional questions. Thank you. Okay. Thank you. Mr. Fick. Thank you, Your Honor. So very important point of clarification with regard to count four. Even if the stipulation were properly in evidence, all that stipulation says is that Allied Health Clinic was a health care benefit program. That does not, as a separate ground of acquittal, solve the source of funds problem on count four. The issue on count four is that the funds for that particular alleged embezzlement came from HMG, not Allied Health Clinic. And so therefore the government's failures of proof, which the court highlighted during its argument, the absence of any evidence about where the money in HMG came from is fatal there. Because HMG was not a health care benefit program. Nobody ever suggested it was because it didn't have the contracts, it wasn't serving patients, et cetera. And so what we have then is just the government's speculation, which frankly I found difficult to follow, about some inference about how HMG's funds came from the clinic. And there's simply no evidence to support that. In fact, the operating agreements, which were in evidence, and the gravamen of the testimony was that at this point, Terosian was personally funding both of these entities. That means these are personal funds, not health care benefit funds. That's the only thing that the evidence came close to showing. And so therefore, even if the stipulation is in, acquittal is required on count four. Judge Storia, any final questions on this case? No, I have no questions. Thank you.  Thank you. You're welcome.